IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

BORIS TOUMASIAN,

Defendant.

CRIMINAL CASE NO.

1:10-CR-0291-TCB-JFK-3

## REPORT AND RECOMMENDATION

Pending before the court are Defendant Boris Toumasian's motion [Doc. 35] to suppress statements and motion [Doc. 36] to suppress evidence.  The motion to suppress evidence challenges the admissibility of evidence seized during the execution of two search warrants issued by a Magistrate for the Court of Fulton County, Georgia, for apartments located at 5104 Jameson Pass and 8107 Jameson Pass, Alpharetta, Georgia, and of evidence seized as the result of a consent search of a Ford Probe located at the apartment complex.  [Doc. 36].  And the motion to suppress statements seeks to suppress a statement made by Defendant, without Miranda warnings having been given, during the execution of the search warrants.  [Doc. 35].  An evidentiary hearing was held on April 19, 2011, on the motion to suppress the consent search of

the vehicle and on the motion to suppress Defendant's statement.[1]  [Doc. 43].  The

Defendant filed a post-hearing brief which challenged the issuance of the search

warrants on the ground that the affidavit in support did not establish probable cause,

but the post-hearing brief did not challenge the consent search of the vehicle.  The brief

also challenged Defendant's statement on the ground that he was in custody and should

have been advised of his <u>Miranda</u> rights and, alternatively, that the statement was

tainted by the unlawful search of the apartment.  [Doc. 44].

      The court finds that Defendant abandoned any challenge to the search of the

Ford Probe when he failed to mention the search in his post-hearing brief.  <u>See</u> <u>United</u>

<u>States v. Zekic</u>, 2010 WL 4962985, at *1 (N.D. Ga. October 28, 2010) (citing <u>Access</u>

<u>Now, Inc. v. Southwest Airlines Co.</u>, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[T]he law

is by now well settled in this Circuit that a legal claim or argument that has not been

briefed before the court is deemed abandoned and its merits will not be addressed.")),

<u>adopted by</u> 2010 WL 4967825 (N.D. Ga. December 1, 2010).  And, in any event, as

argued by the Government, the evidence established that (1) Defendant voluntarily

consented to the search, which resulted in the seizure of a baseball cap matching that

worn by a suspect during the illegal activities under investigation, <u>see</u> <u>United States</u>

---

    [1]Citations to the evidentiary hearing transcript are:  (Tr. at ).

2

v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) ("It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search an individual without a warrant so long as they first obtain the voluntary consent of the individual in question."), and (2) there was probable cause to search the vehicle, which was readily mobile, pursuant to the automobile exception to the warrant requirement, see Pennsylvania v. Labron, 116 S. Ct. 2485, 2487 (1996) (Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."); United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007) ("The requirement of mobility is satisfied merely if 'the automobile is operational.'") (citation omitted).  [Doc. 45 at 24-25].

As to the arguments presented by Defendant in his post-hearing brief, the Government responds that the affidavit in support of the search warrants for both apartments established probable cause and that the question posed to Defendant about his residency did not constitute interrogation or, in the alternative, that Defendant was not in custody at the time of the questioning.  [Doc. 45].  After consideration of the totality of the circumstances, the court recommends that Defendant's motions to suppress be denied.

## I.    Facts

In the fall of 2008, the Alpharetta Police Department investigated fraudulent activity involving "skimming" of the encoded debit cards belonging to approximately thirty victims.  (Tr. at 5-6).  Because the victims were in possession of their debit cards, investigators believed that the cards were being copied and then used at various locations to withdraw funds from the bank accounts associated with the debit cards without the authorization of the debit card owners.  (Tr. at 6).  Based on the investigation, the officers believed the "skimming" occurred at a B.P. gas station located in Alpharetta, and they identified as having worked at the gas station Defendant Toumasian and one of his co-Defendants, Karen Khalatyan.  The officers also identified another co-Defendant, Edmond Alexanyan, as being a friend, living in the same apartment complex as Defendant Toumasian.  (Tr. at 6).

Based on examination of the videotapes at the ATMs where the skimmed debit cards were used, the officers had descriptions of the men using the debit cards, and they identified the men, Defendants Toumasian, Alexanyan, and Khalatyan, using their driver's licences.  (Tr. at 6).  The officers obtained search warrants for the two apartments associated with the men, 5104 and 8107 Jameson Pass, in Alpharetta,

Georgia, which were executed on December 10, 2010.[2]  (Tr. at 7-8; Gov't Ex. 1); [Doc. 44-1, 44-2].   The officers first approached and knocked on the door to apartment number 8107, announcing their presence.  When no one answered the door, the officers forced it open and entered the apartment with their firearms drawn.[3]  (Tr. at 8, 20). Upon entry, the officers found Ara Artuni sitting on a couch in the living room and observed Defendant Toumasian standing in the middle of the apartment.  (Tr. at 8, 20). Both men were asked to lay face down on the floor, and they were handcuffed as other officers quickly secured the apartment checking for other occupants, which is standard procedure when executing a search warrant.  No one else was inside the apartment. (Tr. at 8-10, 20).  This process took less than five minutes.  (Tr. at 10).

Once the apartment was safe, the officers' firearms were holstered, and Defendant Toumasian and Mr. Artuni were seated up-right against the wall in the living room area.  (Tr. at 8-9, 12, 21).  Detective David Bochniak, Alpharetta Police

---

[2]The lease for apartment number 8107 was in Defendant Alexanyan's name, and the lease for apartment number 5104 was in Defendant Toumasian's name.  (Tr. at 16-17).

[3]Five to ten officers were present and entered the apartment. (Tr. at 9, 32).  Most of the officers were attired in casual clothing with police vests; however, a couple of uniformed officers were present.  (Tr. at 20-21).  After securing the apartment, some of the officers left to execute the warrant at apartment number 5104 where Defendant Alexanyan was located.  (Tr. at 32).

5

Department, then asked both men who lived in the apartment.  (Tr. at 10, 12, 21).

Defendant Toumasian responded that he lived in the back bedroom, and Mr. Artuni

responded that he was just visiting.  (Tr. at 11).  Detective Bochniak stated that the

question was asked as part of standard procedure in making contact with the residents

of a location being searched to explain why the officers are present and because a list

of the items seized has to be left with the resident.[4]  (Tr. at 11).

At the time the question was asked, Defendant remained handcuffed but was not

being touched by the officers.  (Tr. at 9).  Defendant had not been told that he was

under arrest or that he was not free to leave, although the detective testified at the

hearing that Defendant was not free to leave, and Defendant did not ask to leave.  (Tr.

at 12, 21).  As noted, the officers' firearms were no longer drawn.  (Tr. at 12).

Detective Bochniak did not make threats or promises to Defendant to obtain a response

to his question, and the tone of the conversation was normal.  (Tr. at 12-13).  The

---

[4]In explaining why the officers were at the apartment, Detective Bochniak advised that Defendant Khalatyan had been arrested earlier that day.  He stated that neither Defendant Toumasian nor Mr. Artuni appeared to know Khalatyan or if he lived in the apartment.  (Tr. at 17).  The Government does not make reference to any specific statement allegedly made by Defendant Toumasian about Defendant Khalatyan; therefore, the court assumes that the Government does not intend to offer into evidence any such statement.

6

conversation was in English, which Defendant appeared to understand.[5]  (Tr. at 13).

At the time the question was asked, the officers had not found any evidence associated

with the fraudulent debit card activities but had smelled the odor of burning marijuana

as they entered the apartment and had observed a small amount of burning marijuana,

as well as another small quantity of marijuana, in Mr. Artuni's vicinity.[6]  (Tr. at 14-15).

Defendant Toumasian and Mr. Artuni were arrested on drug charges.  (Tr. at 24).

As Defendant Toumasian was being escorted from the apartment for transportation to

the police station, another Alpharetta officer, Michael Davis, asked Defendant for

consent to search a Ford Probe parked outside the apartment.[7]  (Tr. at 27-28).  The Ford

was in Defendant's name, and officers had observed all three Defendants operating the

vehicle during the investigation, including earlier that day.   Defendant verbally

responded in the affirmative.  (Tr. at 16, 19).  While standing outside of the vehicle and

---

[5]The detective said that he had had a conversation with Defendant the week before in English.  (Tr. at 13-14).

[6]When the search warrant was executed, the officers found items associated with the "skimming" operation as well as a quantity of cocaine.  (Tr. at 15).

[7]Although Defendant remained handcuffed, the officer did not have his weapon drawn, no threats or promises were made to obtain Defendant's consent, and the tone of the conversation, which was in English, was light.  (Tr. at 24, 28-29).  Defendant was not told that he could refuse to consent to the search.  (Tr. at 32).

7

prior to asking for consent to search, Officer Davis had observed in the back seat of the Ford a baseball cap matching the appearance of a cap observed being worn by a suspect in the videotape of the ATMs when the fraudulent withdrawals were taking place.  (Tr. at 18, 27, 29-31; Gov't Exs. 2, 3).  The cap was seized from the vehicle. (Tr. at 27, 29).

The same affidavit was used to support the search warrant for each apartment. Detective Bochniak was the affiant for the search warrant affidavit. [Doc. 44-1, 44-2]. The affidavit began by outlining the investigation into the "skimming" of the debit cards during the fall of 2008 and explained why the thirty incidents under investigation appeared to be related, this is, all of the victims resided in Alpharetta within a few miles of each other, all had their debit cards in their possession when the fraudulent withdrawals were made, and the majority of these withdrawals were in North Fulton County at Presto ATMs located at Publix Supermarkets or Wachovia ATMs located at QT gas stations.  [Id.].  The affiant then explained how the three men believed to be involved were identified based on examination of the videotapes from the ATMs where the fraudulent withdrawals were made by using their appearance and the clothing they wore.  [Id.].  The affiant then linked the prior fraudulent withdrawals with eight reported fraudulent withdrawals occurring in the first seven days of December at Presto

8

ATMs located in North Fulton County by a white male, who had been observed in earlier videotapes, who usually wore a grey fleece, dark colored jeans and a baseball cap with the "AE" logo.  [Id.].

The affidavit next explained how the investigators identified the BP gas station located at 11425 Haynes Bridge Road as the location where the debit cards were skimmed because all of the victims had shopped at that location and then how Defendants Khalatyan and Toumasian, former employees of the gas station, were identified.  The affiant explained that Defendant Toumasian was determined to lease an apartment, number 5104, at Jamison Pass in Alpharetta, and was a friend of Defendant Alexanyan, who leased apartment number 8107 in the same complex.  [Id.]. The affiant further stated that, although Defendant Khalatyan did not live at the apartment complex, he was often seen there, particularly in the vicinity of apartment number 8107, and that on December 10, 2008, Defendant Khalatyan was arrested for giving a false name and date of birth and had stated that he lived at Jamison Pass, not providing an apartment number.  [Id.].

The affidavit then provided background information on the three men indicating that they had recently moved from California and were originally from areas in and around the former Soviet Union, that Defendants Toumasian and Alexanyan had prior

AO 72A
(Rev.8/82)

arrests for credit card fraud, and that the driver's license photographs of the three men resembled the men depicted in the ATM surveillance videotapes.  [Id.].

The affiant next outlined the surveillance conducted since mid-November of the men and of the two apartments at Jamison Pass resulting in the identification of two vehicles, (1) a 2006 blue Honda Accord, registered in California to the prior address of Defendant Alexanyan, who had been observed driving the vehicle by apartment leasing agents, and which was observed usually parked at building 8000 but sometimes at building 5000, and (2) a 1997 Ford Probe, registered to Defendant Toumasian, 900 Jamison Pass, and that Defendant Khalatyan had been seen by leasing agents driving the vehicle, which was always observed by officers parked at building 8000.  [Id.].  In early December, surveillance officers observed Defendant Khalatyan leave the area of the apartments where 8107 is located, enter the Honda and leave.  [Id.].

The affiant detailed the events observed on December 4, 2010, at 12:00 a.m., involving Defendants Khalatyan and Toumasian, after they were observed leaving Jamison Pass in the Honda.  The men were followed to the BP located at 11425 Haynes Bridge Road, where they spoke with a clerk for a few minutes, and then at 12:30 a.m., Defendants left the BP and were followed to the intersection of Haynes Bridge Road and Old Milton Highway, where surveillance lost the vehicle.  Defendant Khalatyan

10

was observed wearing the grey fleece, dark grey jeans, and white shoes with a blue stripe.  [Id.].  The next day a victim reported unauthorized withdrawals from his checking account on December 4, at 1:04 a.m., at a Publix Presto ATM located approximately seven and one-half miles from where surveillance lost track of Defendants.  The videotape of the ATM depicts a male wearing the same clothing as that of Defendant Khalatyan, along with the baseball cap with the "AE" logo.  [Id.].  The affidavit also states that on December 10, 2008, at 9:00 a.m., investigators observed the Honda, parked near apartment number 8107, and saw two baseball caps in the back seat, including the one with the "AE" logo, which had been observed in the ATM videotapes at the time of various fraudulent withdrawals.  [Id.].

The affiant concluded the affidavit by stating that approximately thirty reports of debit card fraud had been complained about in Alpharetta resulting in $30,000 in loss in two months, that Defendants Khalatyan, Toumasian, and Alexanyan were the prime suspects, and that the men reside in 8107 and 5104 at Jamison Pass and migrate between the apartments.  [Id.].

Additional facts will be set forth as necessary during discussion of Defendant's claims.

11

## II.    Discussion

### a.    Search Warrants

Defendant first contends that the affidavit offered in support of the search warrants for apartments number 5104 and number 8107 does not establish probable cause because the affiant fails to establish a nexus between the alleged criminal activity and the places to be searched and that, because the affidavit is facially deficient in establishing probable cause, the good faith exception does not apply in this case. [Doc. 44 at 4-7]. The Government counters that the affidavit for the search warrants, based on the reasonable inferences drawn from the facts set forth therein, does establish a nexus between the criminal conduct and the apartments and that, in any event, the good faith exception does apply. [Doc. 45 at 10-17].

In deciding whether to sign a search warrant, the issuing judge is "'simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" <u>United States v. Jiminez</u>, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting <u>Illinois v. Gates</u>, 103 S. Ct. 2317, 2332 (1983)). In this regard, "'probable cause is a fluid concept – turning on the assessment

of probabilities in particular factual contexts[.]'" United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determination." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same).  In reviewing the issuance of the search warrant, the undersigned must determine only that the Magistrate had a "substantial basis" for concluding that probable cause existed to uphold the warrant.  See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam).  The validity of the warrant is considered based on the totality of the circumstances.  See Brundidge, 170 F.3d at 1352.

Specifically, when the challenge raised is a lack of nexus between the place searched and the items being sought and involves the residence of a defendant, the Eleventh Circuit Court of Appeals recently stated that "the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might

13

keep evidence of his crimes at his home, i.e., a 'safe yet accessible place.'"  United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting United States v. Feliz, 182 F.3d 82, 87-88 (1st Cir. 1999)).  The court in Kapordelis further stated in connection with searching a suspect's home:

> "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained.  In normal situations, few places are more convenient than one's residence for use in planning and hiding fruits of a crime."

Id. (quoting United States v. Green, 634 F.2d 222, 226 (5th Cir. Unit B 1981)); see also United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009) ("'Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant. . . .'") (citation omitted); United States v. Wiley, 475 F.3d 908, 916 (7th Cir. 2007) ("'. . . issuing judges are entitled to draw reasonable inferences about where evidence is likely to be found given the nature of the evidence and the type of offense'") (citation omitted).  Therefore, while the affidavit must establish a link between the defendant and the residence to be searched as well as between the residence and criminal activity, "[t]here need not be an allegation that the illegal activity occurred at the location to be searched. . . ."

14

Kapordelis, 569 F.3d at 1310 (citing, e.g., United States v. Anton, 546 F.3d 1355, 1358

(11th Cir. 2008) (holding that evidence establishing that a defendant possesses

contraband of the type that would normally be expected to be hidden in a residence will

support the search); United States v. Jenkins, 901 F.3d 1075, 1080-81 (11th Cir. 1990)

(finding that nexus between the items to be seized and a defendant's residence can be

established circumstantially if the contraband is capable of being hidden therein)).[8]

In this case, the affidavit establishes that Defendants Toumasian, Alexanyan and

Khalatyan were involved in the fraudulent activity using "skimmed" debit cards to

make unauthorized withdrawals of funds from bank accounts associated with the debit

cards during the fall of 2010.  This activity involved thirty victims and resulted in

$30,000 in fraudulent withdrawals.  [Doc. 44-1, 44-2, Search Warrant Affidavit].

---

[8]In Anton, the affidavit for a search warrant for the defendant's residence
provided that agents had observed the defendant, along with his trailer, at gun shows
and had observed the defendant in possession of firearms at the gun shows, that an
informant had advised that the defendant possessed over 300 guns, and that, based on
the agent's experience, convicted felons and firearms dealers typically store contraband
items on their property.  Based on this information, the court found that the search
warrant was supported by probable cause. 546 F.3d at 1358.  And, in Jenkins, a case
involving a bank larceny, the Eleventh Circuit Court of Appeals held that a warrant
established probable cause to search the residence of the individual who probably
committed the theft because the items sought were capable of being hidden in a
residence and because, based on the agent's opinion, stolen items are likely to be
hidden in the residence of the thief. 901 F.2d at 1081.

Based on the reports of the victims, police officers identified the BP gas station located at 11425 Haynes Bridge Road, the location where Defendants Toumasian and Khalatyan had worked, as the place where the debit cards were skimmed. [Id.]. Also, individuals resembling the Defendants were observed on the videotapes of the ATMs, all located in the North Fulton County area, where the fraudulent withdrawals were made. [Id.]. The affidavit also linked the three Defendants to the 5104 and 8107 Jameson Pass apartments. Defendant Toumasian leased the apartment located at 5104, and Defendant Alexanyan leased the apartment at 8107. And all three men were observed by officers leaving from and going to the apartments, and the officers observed two vehicles associated with the men, a 2006 blue Honda Accord and a 1997 Ford Probe, parked at the buildings in which these apartments were located. [Id.]. Additionally, the apartment complex is located in Alpharetta in the vicinity of the BP gas station where the debit cards were skimmed and in North Fulton County where the fraudulent transactions took place. [Id.].

Significantly, on December 4, 2010, Defendants Toumasian and Khalatyan were observed leaving at midnight from the apartment complex in the Honda Accord and traveling to the BP gas station located on Haynes Bridge Road where they met with a gas station clerk. Based on a complaint from another victim later on December 4

16

concerning fraudulent withdrawals from an ATM using his debit card and after examining the videotape of the ATM, the affiant concluded that Defendants had engaged in another fraudulent debit card transaction at 1:04 a.m., on December 4, 2010, at a location near where they were last observed by surveillance officers.  And, just a few days later, on December 10, the baseball cap worn by Defendant Khalatyan in that transaction was observed in the Honda Accord, parked outside the building housing apartment number 8107.  [Id.].  The timing of and locations of the fraudulent activity provides an additional link between the criminal conduct and the apartments for which the warrants were sought, especially given the reasonable inferences which the Magistrate issuing the warrants may draw from the all of the facts in the affidavit.

Courts have applied the reasoning set forth in Kapordelis, Alexander, Wiley, and the other cases cited *supra* and upheld search warrants issued by judges drawing reasonable inferences that a participant in crimes involving unlawful financial and fraudulent activity, stolen property, and related criminal conduct will probably maintain evidence of those crimes in a secure and readily accessible location, that is, his or her residence.  In United States v. Abboud, 438 F.3d 554 (6th Cir. 2006), the Sixth Circuit Court of Appeals rejected a defendant's argument that the affidavit for a search warrant failed to establish a sufficient nexus between the criminal activity,

17

bank fraud, and his residence and business.  Holding that the defendant's argument was without merit, the court stated, "One does not need Supreme Court precedent to support the simple fact that records of illegal business activity are usually kept at either a business location or at the defendant's home.  Likewise, personal financial records are also usually stored at a person's home or place of business." Id. at 572. See, e.g., United States v. Maestas, 546 F.2d 1177, 1179-80 (5th Cir. 1977) (noting that there was no firsthand evidence in affidavit that items related to crimes of interstate transportation of forged checks would be in the defendant's residence, the court stated that "this is not always necessary" and noted for instance that "evidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence"); United States v. Waxman, 572 F. Supp. 1136, 1146 (E.D. Pa. 1983) (in upholding warrant to search defendant's residence based on reasonable inferences from facts in affidavit, which lacked direct evidence linking the residence to the crime but stating that the defendant, an art collector, was implicated in a theft of fine art which had not surfaced in art community, the court noted, ". . . 'direct observation [of the objects in the place] . . . [is] not necessary and . . . normal inferences about where criminals would be likely to hide property . . . [are] sufficient, taking into account the type of crime, the nature of the

18

items, and opportunity for concealment'") (citation omitted); <u>United States v. Santarsiero</u>, 566 F. Supp. 536, 542 (S.D. N.Y. 1983) (in a case in which search warrant sought evidence of fraudulent use of credit cards at residence of known participant in the criminal activity, the court rejected the defendant's argument that the affidavit failed to provide a nexus between his actions and his residence stating that "[t]he items specified in the search warrant were the types of things that a person who had participated in the [crimes alleged] might possess[, and m]oreover, defendant's car and residence were the only logical or likely locations at which these items might be found") (citations and internal quotations omitted).

The common sense and reasonable inferences that the Magistrate was entitled to draw from the close proximity between Defendants' residences and the criminal conduct is that evidence related to that conduct would be stored in a location offering easy access and security such as provided by Defendants' nearby residences.  <u>See United States v. Jones</u>, 994 F.2d 1051, 1057 & n.6 (3rd Cir. 1993) (noting that all of the defendants' homes were on the island of St. Croix, where the criminal offenses occurred, "making all of their homes a likely repository for evidence"); <u>United States v. McKinney</u>, 758 F.2d 1036, 1043 (5th Cir. 1985) (noting that the nexus between the place to be searched and the items to be seized may be established either by direct

evidence or "'normal inferences as to where the articles sought would be located[,]'" the court stated that, "[i]n determining whether a magistrate has drawn a 'normal inference' that evidence, fruits or instrumentalities of crime might be found at a given location, we have considered both the distance between the criminal activity . . . and the premises to be searched and the nature of the criminal activity") (citation omitted); United States v. Gonzalez, 2010 WL 2721882, at **16 n.20 & 17 (N.D. Ga. May 25, 2010) (noting that the issuing judge was allowed to draw reasonable inferences, in light of proximity of the defendant's residence to location of robbery and observations of the defendant at his residence in relation to the timing of the robbery, to provide the nexus between the criminal conduct and the residence, and finding that including experienced law enforcement officer's opinion confirming those inferences was not necessary to establish probable cause), adopted by 2010 WL 2721540 (N.D. Ga. July 7, 2010).

Commonsense indicates that the place for the Magistrate to conclude Defendants would leave from and return to while engaging in criminal conduct in the vicinity of their residences was their residences, therefore, evidence of that unlawful activity will most probably be found in those locations. This conclusion is especially reasonable in a case such as set out in the affidavit which actually documented Defendants

20

Toumasian and Khalatyan leaving from the apartment complex to engage in the fraudulent debit card activity and where evidence linked to that activity is observed a few days later in the vehicle used to commit the crime while it is parked outside the apartments to be searched.  As the district court in Santarsiero stated, "'[J]udges are not required to exhibit a naivete from which ordinary citizens are free.'"  566 F. Supp. at 542 (quoting United States v. Stanchich, 550 F.2d 1294, 1300 (2nd Cir. 1977)).

Finally, even if the court found that the affidavit for the search warrants failed to establish probable cause, the court agrees with the Government that the good faith exception to the exclusionary rule should be applied to this case.  In United States v. Leon, 104 S. Ct. 3405 (1984), and Massachusetts v. Sheppard, 104 S. Ct. 3424 (1984), the Supreme Court established a good faith exception to the exclusionary rule where officers placed reasonably objective reliance on a search warrant later determined to be defective.  In United States v. Accardo, 749 F.2d 1477 (11th Cir. 1985), the Eleventh Circuit Court of Appeals discussed the good faith exception established by the Supreme Court.  With the exception of cases "where the issuing magistrate wholly abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to

21

particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid[,]" the good faith exception applies. Id. at 1480 & n.4 (citations omitted).  The good faith exception "require[s] suppression 'only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.'" Id. at 1480 (quoting Leon, 104 S. Ct. at 3422).  In making this decision, the totality of the circumstances surrounding issuance of the search warrant may be considered.  Id. at 1481.

Defendant, however, contends that the exception does not apply in this case because the warrant is based on an affidavit "'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"   [Doc. 44 6-7 (citations omitted)].  Defendant's argument attacking the warrant focuses on the alleged lack of probable cause.

Defendant's attack lacks merit.  First, the court notes that the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in Leon found indicative of warrants falling within the third exception to the good faith doctrine.  See United States v. Glinton, 154 F.3d 1245, 1257 (11th Cir. 1998).  The court has outlined the detailed

information provided by the affiant in support of the search warrant, including the

Defendants' association and participation in the fraudulent debit card activity,

Defendants' ties to the locations to be searched, and observations of Defendants

leaving from and returning to the locations in relation to the fraudulent activity

occurring. [Doc. 44-1, 44-2, Search Warrant Affidavit]. This affidavit presented much

more than conclusory, "bare-bone" assertions for consideration by the Magistrate. The

affidavit provided factual details for the Magistrate to consider and evaluate. And

other courts that have considered similar affidavits offered in support of search

warrants for residences closely associated with individuals engaged in fraudulent

conduct and related activities have applied the good faith exception. See, e.g., United

States v. Van Shutters, 163 F.3d 331, 337-38 (6th Cir. 1998) (affidavit established the

defendant's participation in ongoing criminal activity, i.e., fraudulent purchases of

automobiles using counterfeit checks, etc., and provided details regarding the residence

to be searched, including that rooms in the residence were "available to John Doe aka

Jim Thompson aka John Van Shutters" but failed to state explicitly why affiant linked

defendant to the residence). The officers were, therefore, entitled to rely upon the

Magistrate's evaluation and determination that "given all the circumstances set forth

in the affidavit before him, there [was] a fair probability that contraband or evidence

of a crime [would] be found in a particular place."   <u>Gates</u>, 103 S. Ct. at 2332.

Accordingly, even if the affidavit for the search warrants did not establish probable

cause, the good faith exception applies and the motion to suppress should be denied.

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc.

36] to suppress evidence be **DENIED**.

### b.     Statement

Defendant next contends that the statement he made, that is, that he resided in

the back bedroom of apartment number 8107, on December 10, 2010, was obtained in

violation of his Fifth Amendment rights because he was in custody and not advised of

his <u>Miranda</u> rights when interrogated and that, therefore, the statement should be

suppressed.[9]  [Doc. 44 at 7-8].  The Government opposes the motion to suppress the

statement contending, first, that Defendant was not being interrogated when the

information was provided about his residence and, in the alternative, that Defendant

---

[9]Defendant does not contend that the statement was otherwise involuntary, and
the evidence before the court would not support such a finding.  <u>See</u> <u>Colorado v.</u>
<u>Connelly</u>, 107 S. Ct. 515, 520 (1986) (cases where courts have found confessions to
be involuntary "have contained a substantial element of coercive police conduct");
<u>United States v. Mendoza-Cecelia</u>, 963 F.2d 1467, 1475 (11th Cir. 1992) ("Sufficiently
coercive conduct normally involves subjecting the accused to an exhaustingly long
interrogation, the application of physical force or the threat to do so, or the making of
a promise that induces a confession."), <u>abrogated on other grounds</u>, <u>Coleman v.</u>
<u>Singletary</u>, 30 F.3d 1420 (11th Cir. 1994).

was not in custody at the time he made the statement.  [Doc. 45 at 17-23].  Defendant

bears the burden of establishing that he was in custody and that he was being

interrogated.  See United States v. de la Fuente, 548 F.2d 528, 533 (5ᵗʰ Cir. 1978).

In Miranda v. Arizona, 86 S. Ct. 1602 (1966), the Supreme Court held that "a

person questioned by law enforcement officers after being 'taken into custody or

otherwise deprived of his freedom of action in any significant way' must first 'be

warned that he has a right to remain silent, that any statement he does make may be

used as evidence against him, and that he has a right to the presence of an attorney,

either retained or appointed.'"  Stansbury v. California, 114 S. Ct. 1526, 1528 (1994)

(quoting Miranda, 86 S. Ct. at 1612).  The Supreme Court recently clarified "that the

freedom-of-movement test identifies only a necessary and not a sufficient condition for

Miranda custody."  Maryland v. Shatzer, 130 S. Ct. 1213, 1224 (2010).  The Court

stated, "We have declined to accord it 'talismanic power,' because Miranda is to be

enforced 'only in those types of situations in which the concerns that powered the

decision are implicated.'"  Id. (quoting Berkemer v. McCarty, 104 S. Ct. 3138, 3148-

49 (1984)).[10]  Accordingly, "[a]n officer's obligation to administer Miranda warnings

---

[10]Applying this test to an investigative detention, the Eleventh Circuit Court of
Appeals explained:

25

attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" <u>Stansbury</u>, 114 S. Ct. at 1528 (quoting <u>Oregon v. Mathiason</u>, 97 S. Ct. 711, 714 (1977) (per curiam)); <u>accord</u> <u>United States v. Brown</u>, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person

---

[A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been "seized" by law enforcement – he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .

Rather, "a free-to-leave inquiry reveals *only* whether the person questioned was seized.". . . While "seizure is a necessary prerequisite to <u>Miranda</u>, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

<u>United States v. Luna-Encinas</u>, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted and emphasis in original); <u>see also</u> <u>United States v. Ellison</u>, 632 F.3d 727, 729 (1st Cir. 2010) ("in dealing with a case outside the <u>Miranda</u> paradigm [that is, interrogation of a suspect at the police station], it is essential to recall that 'the freedom-of-movement test identifies only a necessary and not a sufficient condition for <u>Miranda</u> custody[,]'" the district court explained, "[t]hat is, custody under <u>Miranda</u> means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of <u>Miranda</u>") (quoting <u>Shatzer</u>, 130 S. Ct. at 1224).

being questioned."[11]  Stansbury, 114 S. Ct. at 1529; accord United States v. Beltran, 367 Fed. Appx. 984, 988 (11th Cir. 2010) ("Because the test is objective, the subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave is irrelevant."); United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (same).  "'[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person.'"  Street, 472 F.3d at 1309 (citation omitted); see also Brown, 441 F.3d at 1347 (same); United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

The circumstances before the court fall outside "the Miranda paradigm[,]" that is, interrogation of a suspect at the police station, Ellison, 632 F.3d at 729, or similar circumstances establishing the functional equivalent of an arrest requiring Miranda warnings.  After consideration of the facts surrounding Defendant's detention and the question posed to him about his residency, the court finds that Defendant was not in "custody" when the question was asked, therefore, Miranda warnings were not required.

---

[11]However, "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned." Stansbury, 114 S. Ct. at 1529-30.

The fact that Defendant was physically detained and handcuffed while the search warrant was executed does not necessitate a finding that Defendant was under arrest or in "custody."  In fact, in Michigan v. Summers, 101 S. Ct. 2587, 2595 (1981), "for Fourth Amendment purposes, [the Supreme Court held that] a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."  Such a detention is not automatically the equivalent of a formal arrest.  Id.  The rationale for allowing the temporary detention in Summers, that is, "preventing flight in the event incriminating evidence is found," "minimizing the risk of harm to the officers[,]" and facilitating "orderly completion of the search," id. at 2594, is applicable to the facts of this case indicating that, while Defendant may not have been free to leave, he was not under formal arrest.  See United States v. Ritchie, 35 F.3d 1477, 1483 (10th Cir. 1994) (applying Summers to detention of dwelling occupant during execution of search warrant for evidence, including clothing and stolen currency and cash box).

Furthermore, simply because Defendant's liberty was restrained by the use of handcuffs during the execution of the search warrant does not convert the detention into an arrest requiring Miranda warnings before Defendant is questioned.  See United States v. Davis, 530 F.3d 1069, 1081 (9th Cir. 2008) ("Where an individual has been

28

detained incident to a search warrant, and officers' questioning stays within the bounds of questioning permitted during a <u>Terry</u> stop[, that is, asking a limited number of questions to determine identity and to obtain information to confirm or dispel suspicions], <u>Miranda</u> rights are not required."); <u>United States v. Burns</u>, 37 F.3d 276, 281 (7th Cir. 1995) ("While detention during the execution of a search warrant is not a traditional <u>Terry</u> stop, it is sufficiently analogous for us to conclude that, in the usual case, <u>Miranda</u> warnings are not required."). In <u>United States v. Calloway</u>, 298 F. Supp. 2d 39 (D. D.C. 2003), the district court found that a defendant was not in custody requiring <u>Miranda</u> warnings while being detained during the execution of a search warrant in his residence when he was asked if there was anything in the residence that the officers should know about. The facts in <u>Calloway</u> are similar to those in the instant case. The officers had to use force to breach both the front door of the residence and the door to the defendant's bedroom where he was found; the officers had weapons drawn when entering the residence and for the ten minutes required to secure the residence, then the weapons were holstered; there were a number of officers present; the defendant's hands were cuffed following standard procedures; the officers explained the reason, that is, to execute the search warrant, for their presence; the detention, at the time the question was asked, was temporary, only ten minutes; and the

29

question was not focused on either the defendant's possessions or conduct, that is, not the type asked during custodial interrogation. Id. at 48-49. The court concluded that, at the time the question about whether there was anything in the residence the officers should know about was asked, the "defendant had not been treated any differently than any other person who is secured by the ERT during the execution of a search warrant." Id. at 49.

Likewise, in this case, the facts do not warrant finding that Defendant's brief detention before being asked the general question about residency established that he was in custody. (Tr. at 9-10). The officers breached the door to the apartment only when neither Defendant nor Mr. Artuni, the other occupant, responded to the officers' knocking and announcing their presence. (Tr. at 8, 20). As part of standard procedure, Defendant and Mr. Artuni were asked to lay on the floor and were handcuffed, as other officers secured the residence, all for the safety of the officers and occupants while the search warrant was executed. (Tr. at 8-10, 20). The six to ten officers present had their firearms drawn only for the less than five minutes required to make the residence secure. (Tr. at 9-10, 12, 32). Within minutes of entry, Defendant and Mr. Artuni were seated against the wall, and Detective Bochniak explained to them the reason for the officers' presence in the apartment. (Tr. at 9-10, 21). The conversation was in a

30

normal tone of voice, and Defendant was not threatened or otherwise restrained.  (Tr. at 9, 12-13).  Then, as a part of the routine procedure employed in executing search warrants, the detective asked both men who lived in the apartment.  (Tr. at 10-11, 21). Defendant responded that he lived in the back bedroom.  (Tr. at 10).  Defendant was treated no differently than any other occupant of a residence in which a search warrant is being executed.  And "[s]uch limited questioning, not focused specifically on the suspect's conduct or possessions, is not consistent with the type of police conduct that is the functional equivalent of an arrest."  Calloway, 298 F. Supp. 2d at 49.  The officers did not exploit Defendant's detention nor unduly prolong the detention in order to gain inculpatory information from Defendant.  See Summers, 101 S. Ct. at 2594 (in finding that detention during the execution of a search warrant was reasonable, the Supreme Court relied in part on the conclusion that "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention").  Defendant was not in custody.

And, even if Defendant was in custody at the time the question about who lived in the apartment was asked, he was not subjected to interrogation.  The Supreme Court

31

has held that routine booking questions constitute an exception to the requirement that Miranda rights be given prior to custodial interrogation.  See Pennsylvania v. Muniz, 110 S. Ct. 2638,  2650 (1990).  The Eleventh Circuit Court of Appeals held that "[a]n officer's request for 'routine information for booking purposes is not an interrogation under Miranda, even though that information turns out to be incriminating.'"  United States v. Sweeting, 933 F.2d 962, 965 (11th Cir. 1991) (quoting United States v. Sims, 719 F.2d 375, 378-79 (11th Cir. 1983) (*per curium*)); see also United States v. Guiterrez, 92 F.3d 468, 471 (7th Cir. 1996) ("Prior to or after arresting a suspect, law enforcement officers may ask preliminary questions as to identity, but they may not conduct a custodial interrogation.").

The same conclusion applies to Detective Bochniak's inquiry about who lived in the apartment.  After the apartment was secure and explaining to Defendant and Mr. Artuni why the officers were at the apartment, the detective then asked both men who lived in the apartment.  (Tr. at 10, 12, 21).  Defendant Toumasian responded that he lived in the back bedroom, and Mr. Artuni responded that he was just visiting.  (Tr. at 11).  Detective Bochniak stated that the question was asked as part of standard procedure in making contact with the residents of a location being searched to explain why the officers are present and because a list of the items seized has to be left with the

resident.  (Tr. at 11).  In United States v. Gaston, 357 F.3d 77 (D.C. Cir. 2004), the

court held that such questioning fell within the scope of the Supreme Court's decision

in Muniz.  Id. at 82.  In that case, after the officers entered the residence and secured

in handcuffs the occupants, one officer asked the defendant for his name, address, date

of birth and social security number.  When the defendant gave the residence to be

searched as his address, the officer asked the defendant if he owned the residence, and

the defendant responded that he did, along with his sisters.  Id. at 81.  The court found

that, as was the situation in Muniz, the questions posed to the defendant "related to

'administrative concerns'" and "record-keeping." Id. at 82 (citation omitted).  Because

a copy of the warrant had to be left with the person from whom any items were seized

or from whose residence any property was taken, see Fed. R. Crim. P. 41, the officers

needed to know who resided in the location of the search.  Id.  Accordingly, routine

questions about who lived in the residence did not require Miranda warnings.  See also

United States v. Glover, 211 Fed. Appx. 811, 814 (10th Cir. 2007) (applying Muniz to

questions about residency posed to occupants of residence where search warrant was

being executed).  Therefore, Defendant's response to the officer's question concerning

who lived in the apartment was not part of custodial interrogation and is admissible

into evidence.

AO 72A
(Rev.8/82)

For these reasons, the court recommends that Defendant's motion [Doc. 35] to suppress statements be **DENIED**.[12]

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Docs. 35 and 36] to suppress be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial as to Defendant Boris Toumasian.[13]

**SO ORDERED,** this 19th day of JULY, 2011.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

---

[12]The court finds, having found that the search warrants were based on probable cause, Defendant's alternative argument that his statements were tainted by an unlawful search is meritless.

[13]Note:  Defendants Alexanyan and Khalatyan remain fugitives.

34